Case number 162126. David A. Herr and others versus United States Forest Service and others and Friends of Sylvania and others. Arguments not to exceed 15 minutes for the plaintiffs and 15 minutes to be shared by defendants with five minutes for the intervenors. Mr. Lechner for the appellants. May it please the court. My name is Steve Lechner and I represent appellants Pamela and David Herr who are in attendance today with their son John. This is a really simple case. The issue in this case is the meaning of the five questions. I'm just curious how many property owners are there left? Is it 10? How many roughly? 10 to 13. 10 to 13. 10 to 13 lots. 10 to 13 lots with perhaps not all 13 separately owned so that's why it could be 10 property owners. How many of them are businesses which you know rent out? I know at least the lot. There's the kind of opposite. One's for fishing and one's for not fishing or not motorboats. One's for not motorboats and Kathy Stubeck Thrall's gas-powered motorboats. The one that's not motorboat that's has an easement that disallows it, right? Correct. The Forest Service paid to burden that property with a servitude that bans gas-powered motorboats. So what are the other people that have not been involved in litigation? Are they agnostic? Where are they in all this? It's just such a small lake, small group of people and it's had 25 years of litigation. I can't say where the other riparians are on this. I mean interveners will certainly tell you their position. We know Kathy Stubeck Thrall because she has the injunction that was issued, permanent injunction that was issued by Judge Bell to use gas-powered motorboats. I mean this case is just mostly the Hares versus the Forest Service. And so the others you just all you know is it's roughly ten families or so and we know where three or four of those families stand but that's it? Correct. And there's only two to your knowledge that are in business? One of the interveners and Kathy Stubeck Thrall. Right, but no other businesses? Not that I know of, I'm sorry your honor. And the vacation destination. Okay. One of the principal parts of your argument is you're urging us to incorporate the non-binding holding in Stubeck Thrall too as applied to the the heirs. And I just wonder why we should do that since the non-binding holding and seem to suggest that we do just the opposite of what you're urging. Can you talk about that a little bit? Well, if you're referring to Judge Bell's decision in Stubeck Thrall too that issued the injunction allowing motorboat use, I think it was well reasoned and I think it was the correct ruling. The important thing is to know that after Judge Bell ruled, the Forest Service acquiesced to Gajewski's property with the servitude and dismissed their appeal. But after doing that, the Forest Service didn't go back. After Judge Bell said the five-word savings clause is unambiguous. Subject to valid existing rights means you can't infringe on valid existing rights. The Forest Service acquiesced to that. He said it was unambiguous. The Forest Service should at least, after losing in front of Judge Bell, gone back to reconsider their interpretation of the five-word saving clause. But they didn't. They just stuck the same restrictions into the 2006 Forest Plan. Was there any request by the heirs, any formal request by the heirs to ask the Forest Service to go back and look at that or to revisit it? Well, Harris did not own any property during the 2006 Forest Plan planning process. They purchased in 2010. However, the public, me, wrote a comment letter to the Forest Service, says, look, you've got to go back and look at the motorboat restrictions. Judge Bell's ruling was very authoritative and if you don't go back and look at it again, you're going to be subject to further litigation. But they, in revising the plan, they said motorboat use on Crooked Lake was not a loss in front of Judge Bell. And they said it only applies to one landowner now because we purchased the servitude for the Gajewskis. Therefore, we're not going to look at it again. But there were still the remaining other riparians and now they're the heirs. And they should have at least reconsidered their interpretation of the savings clause. They didn't. So the Forest Service really doesn't have any current interpretation of the savings clause that would be entitled to any deference. All we know is what Department of Justice thinks the savings clause means. The Forest Service has not interpreted it since 1995 when they denied Stupak Thrall's appeal of Amendment 5. And there they said, oh, we can do this because Judge Quist said we could do it. But no member on this panel agreed with Judge Quist's ruling in Stupak Thrall 1 regarding sailboats and houseboats. So this morning, what are the one or two things that you believe that we really need to understand about this case to get it right? How simple it is. We're talking about five-word saving clause subject to valid existing rights. It's a simple case of statutory interpretation. The Forest Service essentially concedes that the heirs' riparian rights are valid existing rights. So now we're down to two words, subject to. Plain meaning of subject to is subordinate to. Therefore, the Forest Service authority to manage the wilderness is... I understand your position with all of that with respect to a but how would this case look if instead of the complete ban what they'd said, and I don't know how Michigan law works on motorboats, but let's just... I'm making it up. Let's just say it's traditional to have things like no wake zones within 100, 150 feet of the shoreline. And so they, you know, you have to have life preservers. So they do things that are very conventional and very typical for lakes this size in Michigan, whether owned by the Forest Service or not. But they do it through a rule. So in that sense, it's just like this case. But I would call it a lot more reasonable. And I think you would agree it's a lot more reasonable. Would your position still be that's just not how it works? That they they have no rulemaking authority when it comes to subject to valid existing rights. If they don't like what the heirs are doing, they have to go to state court and say they're interfering with our riparian rights. Ours being the Forest Service. How would it work with my hypothetical? That it's not a ban and it's just motorboats and it's just like I'll just make it up 150 feet from the shoreline and let's just call that normal. I don't know that it is, but just to be concrete. How would that case work? Well, Michigan does regulate the waters of Michigan. They put in restrictions. The issue in this case is not what the state of Michigan can do. The issue in this case is what did Congress allow the Forest Service to do? So your view would be this phrase subject to valid existing rights. There's nothing for the Forest Service to do. If they don't like what the heirs are doing, they have to go to state court. Or federal. But the key is it would be state law and they'd be asserting their rights as a co-riparian. They couldn't do this through rulemaking. Even rulemaking that you would probably and the heirs would ultimately think was reasonable in the sense of being similar to the way the state has regulated comparable lakes. I think because we're complying with Michigan law, if the Forest Service thinks that the heirs use is unreasonably interfering with the Forest Service's riparian use, they can go to court, seek an injunction. But not through rulemaking is your point. They can do the rulemaking, and this is the thing, this is an as applied challenge. Just the heirs. We didn't facially challenge the regulations, so presumably those regulations can be applied against the general public. So to that extent they can regulate the general public, they just can't apply it to the heirs. No rulemaking as to other riparians. Pardon me? No rulemaking as to other riparians, to co-riparians. That would be your position. That is my position. How hurtful is it to, I mean what's the bad thing that happens if we allow the Forest Service to pass regulations that apply not just to the general public, but to co-riparians as long as it was consistent with what Michigan has done and similarly sized lakes? Well, Congress didn't say that. Congress didn't say subject to valid existing rights as those rights may be regulated under state law. It said subject to valid existing rights. If the Forest Service can get away with what they're doing in this case, it has wide implications because the savings clause subject to valid existing rights is used in hundreds of statutes, mostly federal land management statutes, and out in the West that's serious business. So if they could come in and create a wilderness on top of a mining claim and create it subject to valid existing rights, the mining claim gives you the right to exhaust all the minerals. If they can come in and say, well we're going to make you leave 95% of the gold in the ground, and we say what about the savings clause? I mean they would not get away with doing that out West, telling some miner to leave 95% of the gold in the ground. Here they're basically taking away 95% of the Harris riparian rights because their motorboat ban applies to 95% of the service. Can you give me a handle on the practical effect with respect to the no wake speed limit? Are they in effect not able to motorboat? Well they can't go over, no wake is like one to five miles per hour, so with their electric trolling motor, if they're in the southern reaches of the lake and a storm comes on, it takes them an hour to get home with the electric motor. Gas-powered, 10-15 minutes. So it seriously infringes on their ability to get anywhere on the lake, and there's no evidence that the Harris are unreasonably using their gas-powered motorboat or anything to that extent. They respect Michigan law. Are most of the owners vacationers, part-time, any permanent year-round residents on these 10 to 13 lots? Don't know. You might have to ask the interveners. The stupak thralls, they're not up there in the winter, I don't think. Last I knew. If there are no further questions, I'd like to So we're hearing from the Forest Service first. Is it Haig or Hogg? Haig. Mark Haig from the Department of Justice representing the Forest Service. I guess I would jump right in, Judge Sutton, with some of your questions about rulemaking authority to maybe clarify some of the premises of your question. The Forest Service did figure out their position, and if they won, how would this work? And I'm trying to figure out if, well, if you were listening, you heard what I was saying. Well, I guess the mining claim example that Mr. Lechner gave and the importance of the valid existing rights provision is something that I guess in some sense I do agree with. There are hundreds of wilderness areas in the United States and many national parks, and almost all of the statutes that create those areas include the phrase subject to valid existing rights or something like that. And in other contexts... Aren't they usually referring to state law rights? Yes, but I think typically the concern that's But I guess the point I wanted to make is that if that phrase is interpreted to mean that there's no regulatory authority, that whatever the situation was when the wilderness or the national park was created, that's it for all time. That's an extremely broad view of the impact, and it really hamstrings the federal government's authority to manage its land, which it has the authority to manage under the property clause and under the applicable statutes. But it's not for all time. I mean, things change. People buy easements on property. That changes. State law may change, right? A lot of things have changed, so I don't quite get the point you're making. I guess the point I'm making is that the phrase valid existing rights has to be balanced against the overall wilderness purposes or national park purposes, and I'm making that as a general matter. I'm stating that as a general matter. Put the case in context. Here, the issue... I partly agree with Mr. Lechner. The issue is, what is the scope of the Hare's riparian rights under Michigan law? And what we argue in our brief is that those rights are limited rights and that the they're not limited by the federal government. That's where I'm so puzzled how you think you get to decide what's reasonable for them. Well, I don't think reasonableness isn't the key issue here. We looked at the Michigan Wilderness Act. Excuse me. So just so we're on the same page, reasonableness comes from the norm of riparian rights law. Yes. You know, you're co-riparians and one riparian can't interfere unreasonably with another riparian. So that's where the reasonableness comes from. We're looking to two bodies of state law, one of them being the reasonable use doctrine of Michigan law, as a way of figuring out what is the content, what is the scope of the Hare's riparian rights. Why not? I mean, Mr. Lechner made an important concession. You can do rulemaking. You can say to the public no motorboats. But I guess I'm struggling with why it's not fair to say okay, if two riparians are having trouble, the answer isn't passing a rule and saying we win. The answer is going to federal or state court and then figuring out how state riparian law works here and what's the reasonable compromise. Isn't that a pretty legitimate approach here? That would be one approach that's open to the government. But when Congress created, when Congress enacted the Michigan Wilderness Act, it said manage this area as wilderness, subject to valid existing rights. So to the extent that the Forest Service's management decisions don't unlawfully limit the Hare's riparian rights, which we assume are valid existing rights, the Forest Service can exercise that regulatory authority. So it's a question is what is the scope of the Hare's riparian rights? But how are we to know? We know by looking at... You don't think you get Chevron deferences to that point? No, we're not seeking Chevron deference. So there's no Chevron as to the phrase subject to valid existing rights? There's no Chevron as to the phrase, as to what's the content of the Hare's riparian rights. We assume, we have not pushed the argument that property rights are not valid existing rights. You don't even mention Chevron in your appellate brief. So I assume, unlike in district court, you believe it's an issue we don't need to reach, the Chevron issue. That's right, Your Honor. I think we do cite it. And I think that the phrase, as a general proposition, the phrase valid existing rights is not self-defining or the scope of what that covers. But here we accept the proposition that valid existing rights includes property rights. Under Michigan law, riparian rights are not absolute. So how broad are the Hare's riparian rights? And you argue that the Savings Clause does not prohibit the regulation, that issue, because riparian rights are not absolute, right? That's correct. So help me out. Where in the Savings Clause or elsewhere does it say that the Forest Service has the authority to determine what the rights are? Well, the Forest Service always has the... Whenever a federal agency, whenever the federal agency is doing something that impacts property, the federal government looks to state property law to define the scope of those property rights. That's what the court did in Burlington. So I guess what you would say is, the analogy would be, oh, we wanted to, under state law, we wanted to look at the title of all ten property owners to see if, perchance, there was an easement which prohibited motorboat use. Because if there was, there'd be no problem. Turns out there's only one with that. And then the next point is, well, okay, now we're going to make a state law guess. And our state law guess is a ban is okay. That's the way you would look at it. And it's our call now, whether that's an accurate assessment of state law, almost like an eerie point. Is that... Yes, mostly, yes. Okay, so if I'm framing it correctly, then the problem I have is, everything we have in front of us doesn't make this look like what Michigan would do. In the Bay, none of the co-riparians in the Bay where they would experience the motorboat use the most are complaining about this. Right? Everyone agrees that in the Bay it's okay, and that's controlled by Michigan law. You're not regulating that 5%. And then suddenly the other 95% complete ban, as opposed to saying, don't go over 20 miles an hour, no wake zone within 100 feet of shore, or whatever the normal rules are. So I guess I don't understand how that's plausibly reasonable. I think that the way that you're positing the question assumes that valid existing rights means whatever the status quo was, whatever anybody could do, whatever was not regulated before cannot be regulated now. And I think the word right to drive 55 miles on the highway, when the speed limit goes down to 40, does that take my right? There's a difference between a right, which in this case we're talking about property rights, versus simply a use that has not been conditioned or regulated. And you've conceded that there are restrictions on rights. I mean, under the Michigan Wilderness Act, the Forest Service's rights are in some way restricted. So I'm not sure how that advances your argument. They are in some way restricted, and the question is how much? Right. Are they restricted this much? In Burlington, this court upheld National Fish and Wildlife Service regulations on a wildlife refuge. The United States title to the refuge was acquired with an easement, subject to the use of this property. This court held that the federal government's authority to condition the exercise of that easement was permissible, was within the Fish and Wildlife Service's authority. The fact that somebody has, to simply say, well, we have riparian rights here, as the Harrods do, does not define what the scope of those rights are. The motorboat regulation here, it's not a complete ban on motorized use. It's a ban on gasoline motors and a speed limit. To suggest that, Congress would create a wilderness area, and then say to the Forest Service, but you can't set, create a wilderness area and invite people in to recreate on that area. But say, Forest Service, you don't have the authority to set a speed limit on those waters. That doesn't make sense. But here's what they did. They said subject to valid existing rights. Let me try this question on you and see where it leads. Explain to me how the Forest Service can prohibit what state law allows. In this case, with these facts and with the phrase we're talking about, how can, what allows the Forest Service to do that? The Forest Service has authority under the Michigan Wilderness Act, the Forest Management Act, to manage federal property. And this court in Burlington and the Supreme Court have analogized that to police power property, to regulate federal property to protect it. Everyone agrees they have power to regulate, but it's not unlimited, right? And it's not unlimited. And here is what is a valid existing right. Right. And then we look to this, what is the scope of those riparian rights? And under Michigan law, we know that riparian rights are limited, they're conditional, they're subject to adjustment based on the context. We also know that under Michigan positive law, the state and the counties have broad authority to limit, to completely eliminate motorboats on some lakes or to establish no wake speed zones or electric only motors. So what that tells us is that riparian rights are, it's a use right that is subject to being conditioned. And the Forest Service here is conditioning the exercise of those rights in the same way that the state could. What would happen if Michigan passed a rule, I don't know if it has a Department of Natural Resources, but let's say it does, and it passed a rule that specifically said motorboat use on all of Crooked Lake is allowed. Just don't go more than 20 miles an hour and stay 150 feet from the shoreline, at least if you have a wake. And they're allowed to do that, aren't they? Because they're allowed to regulate the surface. They'd only be regulating the surface of the lake and they have authority just as the federal government has authority over the surface of the lake. What happens to that? I think if you were doing a sort of a standard conflicts analysis, you would look at whether the regulated person could comply with the federal law and the state law. And the fact that the state sets a higher speed limit than the federal government doesn't create a conflict that's possible to comply with. My rule says you're allowed to use motorboats. It's a complete conflict. But it doesn't require anybody to use motorboats. You have a ban and the state says you can use motorboats. I don't know how that's not a conflict. Those are inconsistent. But that's different than saying it's not possible to comply with both. I mean, that hypothetical makes it much, poses a much more difficult question than this case. Wouldn't the state need Trump as long as it's consistent with normal fair treatment of co-riparians? No, not necessarily. Partly because the... We agree early on that the existing valid rights are state law rights. Existing. State sovereign telling us what the rights are. Existing rights. The existing refers to what the situation was in 1987. I don't know. But it's riparian rights. However, they morph over time. Everyone agrees with that, that laws change. I guess at that... I'm not sure what the answer to that is, Your Honor. I think that the focus of the Hare's argument has been, we had the right to do this because our predecessor had the right to do it in 1987 and therefore it's a property right that can't be taken away. Yeah, right. But the existing is relevant here to the analysis of the process and it's the question of what was existing in 1987. I guess I would also point to the en banc dissent in the sailboat's case, Judge Boggs' dissent, where early on in the opinion he says, this regulation is invalid because it takes away the Stupak Thoreau's right to sailboat, which is part of their riparian rights. If the Forest Service had simply adopted a regulation that said, you have to have life preservers on your sailboat, that would be within the Forest Service's authority because the right to motorboat without life preservers is not part of the bundle of riparian rights. We're in that distinction here. The line drawing here is about, is the right to use a gasoline powered motor a property right under Michigan law or is it just the limitation on gasoline motors just conditioning a riparian right, the core of which is a right to access, a right to use the whole surface of the lake, a right to draw drinking water from the lake, but conditioning it by saying, you can't go above a certain speed, you can't use a certain kind of motor in order to protect the federal property that Congress has designated as a wilderness, which is the highest level of protection for federal land. That's where we're drawing the line here. Many other examples are there of lakes where it works like this, where you've got some percentage of the shoreline owned by private property. I mean, isn't this unusual or is it not unusual? I can't give you a number. I know that it is certainly common in Burlington, in the High Point case, which we cited in the 28J letter, where the federal government's ownership involves in-holdings or easements or there are some private interests in the federal government's land ownership. And the federal government needs the authority to condition the exercise of those uses in order to be able to carry out Congress's intent, overall intent of protecting the area that's been designated as a park or as a wilderness. Since you brought up High Point, your opponent responded to your letter somewhat persuasively, I thought. I'll give you a reply if you want. As I stand here right now, I can't remember what Mr. Lechner said about my letter other than he thought it didn't apply. The difference is that the landowners there were found not to have had a valid existing right. Well, I mean, that's exactly the issue here, is what is the scope of the Harrah's valid existing right? If you agree that they have a property right to use gasoline powered motorboats, then we probably lose. But the point is that there isn't a property right to use gasoline powered motorboats at whatever speed they choose just because the state has not previously limited it. But I don't think they're saying whatever speed they choose. I don't think that's right. At speeds above no wake speed. Yeah, I suspect, we'll ask on rebuttal, I suspect their argument is use them the way they're normally used in Michigan lakes of this size. That's what I suspect their position will be, but I'll ask them. I don't think it's as fast as they want to go, the biggest boat possible. But if it is. I don't think they have conceded that they would be subject to horsepower limits. And the no wake speed limit here is important because of the need to protect the federal resource. Loon nests, wild rice beds, general erosion, the fact that this area is now being used by kayakers and canoeists and the impact that the noise of the motorboats running at higher than no wake speed has on silence. There's a lovely, there's an ironic statement in the record about how you can now hear motorboats at Crystal Silence Lake, even though Crystal Silence Lake is not one of the lakes to which the motorboats have access. To prove I'm sensitive to your point, I wish all of you had asked the three of us to go up there to hear arguments so we could also take evidence. But you didn't ask and so we weren't able to do it. But we'll hear from your co-counsel. Thank you very much. May it please the court, we invite you to come up and visit. It's a beautiful, beautiful place. Interveners have environmental, recreational and business interests. They include two of the less than ten owners. Interveners have riparian rights that must also be respected and that's why we're here. So why haven't you gone to state court to say Harris, you're violating our co-riparian rights? Because at this point in time, the federal government has what we believe to be a legal, appropriate... I'm actually talking about the bay. They don't regulate the bay. Perhaps our clients are not as litigious, your honor, and our clients are not people who are going to spend 25 years of their lives litigating. No one on this lake is allowed to deny litigiousness after the last 25 years, in my view. Your honor... In fact, they seem to prefer it to bird watching, canoeing, fishing, all the other lovely things you can do up there. Your honor, Interveners own a business, the Sylvania Wilderness Cabins. They work to keep the wilderness pristine. They've explained in Mr. Schmidt's deposition, I'm sorry, declaration, that loud and fast motorboat use harms his business interests. Customers, people are discouraged from coming because the motorboats disrupt their wilderness experience while they fish and canoe and kayak and try to enjoy the quiet of the outdoors. Loud, high-speed, gas-powered motorboats disrupt their experience. What about riparian rights law under Michigan allows us to favor a group that doesn't want anything motorized versus a group that wants motorized fishing boats so they can fish the whole lake? First of all... I mean, I just don't understand why... what allows us to prioritize one group over the other. It goes to three things. First, let's talk about Michigan law. Secondly, let's talk about... Actually, let me back up. Let's talk about the Wilderness Act for a minute. Your Honor's asked, what's the authority of the federal government to restrict and limit the use of motorboats? It's addressed at page 8 of our brief. Section 1133-D1 of the Wilderness Act of 1964, which is incorporated into the Michigan Wilderness Act, includes Congress's specific authority to the Secretary of Agriculture to impose motorboating restrictions. That's at page 8 of our brief. That's federal law. And the property clause, CLEPI... You're referring to this other piece of legislation which refers to use? Is that what you're referring to? The Wilderness Act of 1964 is then incorporated into the Michigan Wilderness Act of 1987. That specifically authorizes the Forest Service, the Secretary of Agriculture, to impose restrictions on motorboat use. Use, right. And the clause that we're talking about says subject to valid existing rights. And I'll get to that clause. But the first question I believe Your Honor asked was what's the federal authority? That's the federal authority. Under Michigan state law, as we point out at pages 35-37 of our brief, 16 counties have completely banned motorboat use on over 40 lakes in Michigan. And what percentage of those lakes are lakes that are owned by the federal government? Those are owned by the state or owned by counties. They're not owned by the federal government, to the best of my knowledge. We recite them in footnote 8. But we also know there are plenty of lakes in Michigan that allow motorboat use. There are lakes in Michigan that allow motorboat use, but Your Honor's question is, under Michigan law, can the state ban or restrict motorboat use as part of the riparian rights? And yes, they can. They've done that. I think they can. But the best evidence of Michigan law in co-riparian use would be what's going on in the northern bay of this very lake. Why isn't that the best evidence? And thus far, Michigan has not acted on that 5%, but under both CLEPI and the Burlington decision that was referred to, under the Property Clause, the federal government can take action on the 5%. However, that's not what the case is about. The Herr's want to go beyond the 5% to the 95%, and the 95% is under the Wilderness Act  and the 1987 Wilderness Act. This last point is really important, and I don't think it's what the federal government is arguing. But you're saying the subject of valid existing rights doesn't... it's really not about state law. What it is about is it takes you up as far as the Property Clause allows the U.S. government to go. Because that's the only reason you would be talking about those cases that allow the federal government to regulate land that's not theirs because of its effect on land that is theirs. So is that the point you're making? Because I don't think the federal government's arguing that. The Property Clause... Can you answer yes or no first? Yes. The Property Clause allows the federal government to enact the Wilderness Act of 1964 and the Michigan Wilderness Act of 1987. And as the Property Clause has been interpreted, described both in the brief of the federal government and in our brief, it allows the federal government to restrict actions on adjacent areas in order to protect the federal side. I completely understand how it works. The question is whether they exercise that power here. That's the subsidiary question. The federal government, I think, is acknowledging the subject of valid existing rights is proof it's not going as far as it can go because that's a limit. And the limit is state law rights. And where we disagree with the federal government, as your honors know, and where the district court agreed with us is on the second piece of the district court's decision, pages 11 and 12. You're talking about existing? The word existing... You can talk about that, but it's not... It doesn't bear on the point you were just making. The point you were just making is about how far the Congress had tried to go here. One possibility is they have tried to exercise all of the property clause power they have, which asks us to deal with a very different issue. Because some people would say the power the federal government has to deal with private land only goes to nuisance. You're going to have a hard time winning nuisance with motorboat use for fishing. That's not likely to win. But if you want us to deal with that argument, we can. I did not think that argument was in the case, even in your brief. The existing one is in the brief, and I'm happy to hear that, but... Your honor, we make two separate arguments. The first argument goes to the balance and reasonableness of the federal government's action in seeking to balance among different interests of riparian landowners. And in terms of trying to protect the wilderness, this was created by Congress as a wilderness, the highest level of protection. The federal government has regulatory authority under Section 1133, and exercising that regulatory authority, they developed a record in 1995 and 1996, in 2006 and 2007. They appropriately balanced interests. They did not ban all motorboats. They limited it to 4-horsepower electric motorboat engines. And in so doing, they were trying to protect the wilderness values, they were recognizing other riparian landowners, they were trying to avoid invasive species, as they said in 2007, and they were trying to protect the wilderness experience. That is authorized under the Wilderness Act, Section 1133, and that, in our view, was a reasonable exercise of regulatory authority, balancing among competing and different interests, a compromise, if you will, by the federal government. That is also permissible under Michigan law, because 16 counties have completely banned motorboat use on 40 lakes. That's at pages 35 to 37, where we have a different view, turning to a second argument, that's separate, alternate. We're well past the red light, so if you want to, in a minute or two, make this point, that'll be fine, but otherwise I might get a little impatient. Fair enough, thank you, Your Honor. On the existing point, the word existing in the statute, and this is a separate and independent ground for upholding the district court's decision, has to mean something. And existing, just by its very definition, has a temporal meaning. But your client proves how existing could change. You could have riparian rights on one of your client's pieces of property at the time of the Wilderness Act, and the rights could change over time. Why? Because someone, the federal government, could pay for an easement that prohibited the property from being used with motorboats. So, I mean, and another thing, so existing also could reflect the fact that while federal law might not change at all after the Wilderness Act is enacted, state law might change. In fact, you've used that today. But state law changed... All these local localities that have added, you know, no motorboats. So that's why existing is important. It's not that... But riparian rights run with the land. You don't get to destroy this or that stick in the property rights bundle. Your Honor, and on that point, I guess, never like to disagree with a judge, but on this one, we do. Existing in the statute, as the district court found, refers to people who at the time of the Wilderness Act in 1987 were doing certain actions. And if you look at Stupak Thrall 2, the court was very sensitive, Judge Bell, to that there was a landowner there who had a pre-existing use. The plaintiffs in this case were not landowners at that time. They were not innocent purchasers. They had been in the lakes for about 30 years as visitors. They'd even received a ticket for using motorboats. They knew of the limitation when they purchased their land. The purpose of the word existing in the statute is to allow a transition. The whole goal of the Wilderness Act is to create a wilderness-protected experience. One reason the federal government might not be joining you in this argument is that it would create a regulatory taking. I'm going to make up some numbers, but just to illustrate the point, you could have a piece of property that's worth $150,000 when you're allowed to use motorboats on the lake to which it's adjacent. The minute you're not allowed to use motorboats, it may go down to $130,000 in terms of its value. That's a regulatory taking given that interpretation of the word existing. And, Your Honor, the other side of that coin... Our federal government's argument avoids that problem. But, Your Honor, it doesn't avoid the problem. The other side of the coin is if you're a riparian landowner who has bought your property for the quiet enjoyment of being by a wilderness area, where it's going to be quiet and peaceful and the wilderness experience, and you've paid $150,000, and somebody who wasn't existing in 1987 starts running large, loud, gas-powered motorboats that disrupt your experience, then your property value goes down. That's why riparian rights operate on both sides here. That's why existing, from a temporal definition, matters. That's what... That hypothetical would not be a taking, is the point I was making. That wouldn't be a taking because the property owner that hadn't been using motorboats still was allowed to use them. They just weren't using them. And it's true. It's really annoying when neighbors start doing something that other people don't like and they're allowed to do it. You're right. It might effectively lower the value of the property, but that's not a regulatory taking. That's not state action. And that's why the Forest Service, which is allowed to impose restrictions, after compiling a record here that was extensive, balancing among and compromising among riparian owners' interests, didn't outright ban motorboats, said no loud, gas-powered motorboats, as a matter of safety, as a matter of wilderness value. If you were up in the lake and you were canoeing or kayaking and somebody came by at a fast speed on a motorboat, there's a risk it could swamp or flip you over. That's addressed in the affidavit. Lots of lakes have multiple recreational users. That's not unique in any way. And lots of lakes in 16 Michigan counties have banned the use of gas-powered motorboats. It's reasonable to do one thing. It's reasonable to do another thing. It's a balance. We've got your argument, and I think we've been quite generous with the time. So thank you. We'll hear a brief rebuttal. Thank you, Your Honors. I'll try to make it brief. First, the Property Clause is not at issue here. We don't have to figure out the scope of the Property Clause. Of course, that only gives Congress the power. Whatever Property Clause power Congress has, it didn't delegate it all to the Forest Service because of the saving clause subject to valid existing rights. So there's no reason to make a major constitutional issue, or make this case into a major constitutional case about the scope of the Property Clause. Second, Section 4D-1 of the Wilderness Act of 1964 does say something about regulating motorboats, but that authority under the Wilderness Act of 1964 is still subject to the saving clause in Section 5 of the Michigan Wilderness Act, which is the later and more specific act which controls over the General 1964 Act. Moreover, if you're going to look at the Wilderness Act of 1964 and Section 4C, there's also a savings clause in there that protects private existing rights. And the Forest Service has essentially conceded riparian rights would be protected under that savings clause, as they'd also be protected under the savings clause in the Forest Service regulations, which I cited in my 28J letter. Third, under Michigan law, today, the Harriers are allowed to use their gas-powered motorboats at a reasonable speed in a reasonable manner. That's Michigan law. The saving clause does not say anything about subject to valid existing rights as they may be regulated by Michigan's police power or under Michigan's reasonable use doctrine. These riparian rights are constitutionally protected rights. They're not second-class rights, whether you get into the natural and artificial use. In fact, they're probably more valuable today than the natural uses, because nobody really buys riparian land to drink out of the lake. Fourth, there's no reason to get it. Congress has not authorized the Forest Service to preempt state law in this case because of the savings clause. An agency can only preempt state law if Congress says it can't. Here, there's no issue. Congress did not say to the Forest Service to preempt state law. If you follow with the Forest Service interpretations, you're also getting serious federalism concerns. You shouldn't interpret a statute that creates federalism problems. Traditional ability of the states to regulate land and water. Under the Forest Service interpretations, you're infringing upon the state's ability to manage those resources. Existing argument the Forest Service doesn't even buy that argument. Valid existing rights can be freely transferred if you don't lose any rights while you transfer them. That's the last question for you. Other courts that have reviewed this and similar issues have relied on Shakespeare and Macbeth, Otis Redding and his music. Do you have any musical or literary references that you can help us with? I'm not musically talented. I'm sorry, but I also wanted to mention in Burleson Supplemental briefing. One last thing about Burleson, there was no savings clause in Burleson and the Forest Service's ownership was much stronger than it is here because here they share the rights with the heirs. Alright, thank you to all three of you for your excellent briefs and excellent oral arguments. We really appreciate them. It's a difficult case so thank you for all of your help. We'll do our best to resolve it correctly. The case will be submitted.